SECTION:    153
BLOCK:      3
LOTS:       55.2

ADDRESS: 15-17 OLD GICK ROAD
CITY: SARATOGA SPRINGS
COUNTY: SARATOGA COUNTY

## AGREEMENT OF PURCHASE AND SALE

By and Between

CHRISTIAN H. DRIBUSCH AS CHAPTER 7 TRUSTEE FOR AMBICA M&J
TWO LLC, JAGDAMBA II CORP., AND MAHA LAXMI II CORP., Sellers

and

VIA TAVDI LLC, OR ITS DESIGNEE, Purchaser

July 9, 2021

# TABLE OF CONTENTS

**PAGE**

1.  Assests Purchased and Sold ...................................................................................... 3

2.  "Subject To" Provision .............................................................................................. 6

3.  Title Company ............................................................................................................ 8

    3.1.  Title Company ................................................................................................. 8

4.  Purchase Price ............................................................................................................ 10

5.  Acceptable  Funds ...................................................................................................... 11

6.  Prorations .................................................................................................................... 11

    6.1.  Effective Time ................................................................................................. 11

    6.2.  Taxes ................................................................................................................ 12

    6.4.  Utilities ............................................................................................................ 12

    6.5.  Operating Contracts ........................................................................................ 13

    6.6.  Vending and Game Machines .......................................................................... 13

    6.7.  Dues and Commissions .................................................................................... 14

    6.8.  Hotel Business .................................................................................................. 14

    6.9.  Accounts Receivable; Room Revenues ........................................................... 14

    6.10.  Accounts Payable and Expenses .................................................................... 15

    6.11.  Salaries and Benefits ...................................................................................... 15

    6.12.  Advance Bookings .......................................................................................... 16

    6.13.  Operating Supplies ......................................................................................... 16

    6.14.  Not Used ......................................................................................................... 16

    6.15.  Post-Closing Adjustments .............................................................................. 16

    6.16.  Not Used ......................................................................................................... 17

    6.17  Computation………………………………………………………........ 17

7.  Representation, Warranties and Covenants of Buyer ................................................. 17

    7.1.  Existence, Ownership and Good Standing....................................................... 17

    7.2.  Authority .......................................................................................................... 18

    7.3.  No Conflict....................................................................................................... 18

    7.4.  Hart-Scott Filing ............................................................................................. 18

    7.5.  Survival ............................................................................................................ 18

8.  Indemnities; Remedies ............................................................................................... 18

    8.1.  Buyer's Indemnity ........................................................................................... 18

| | | | |
|---|---|---|---|
| | 8.2. | Seller's Remedies | 19 |
| | 8.3. | Buyer's Remedies | 19 |
| | 8.4. | Survival | 20 |
| 9. | | Conditions of Closing | 20 |
| | 9.1. | Conditions to Seller's Obligation | 20 |
| | 9.2. | Conditions to Buyer's Obligation | 20 |
| 10. | | Conveyance of Assets | 21 |
| | (a) | Deed | 21 |
| | (b) | Bill of Sale for Personal Property | 21 |
| | (c) | Assignment and Assumption of Operating Contracts | 21 |
| | (d) | Motor Vehicles | 22 |
| | (e) | FIRPTA Certification | 22 |
| | (f) | TP-584 | 22 |
| | (g) | Safe Deposit Boxes | 22 |
| | (h) | Plans | 23 |
| | (i) | Operating Contracts | 23 |
| | (j) | Books and Records | 23 |
| | (k) | Supplies | 23 |
| | (m) | Advanc Bookings | 23 |
| | (n) | Keys | 23 |
| | (o) | All Required Instruments and Items | 23 |
| | (p) | Assignment of Trade Names | 23 |
| 11. | | The Closing | 24 |
| | 11.1. | Closing Defined | 24 |
| | 11.2. | Closing Date | 24 |
| 12. | | Miscellaneous Covenants and Provisions | 24 |
| | 12.1 | Operation of Business | 24 |
| | 12.2 | Condemnation or Casualty | 26 |
| | 12.3 | Brokers | 27 |
| | 12.4 | Assessments | 28 |
| | 12.5 | Use of Purchase Price to Pay Encumbrances | 28 |
| | 12.6 | Transfer and Recording Taxes | 28 |
| | 12.7 | Franchise Taxes | 28 |

12.8    Assignment ................................................................................... 29

12.9    "As is," "where is," "with all faults" Purchase ................................... 29

12.10   Escrow ......................................................................................... 32

12.11   Notices ......................................................................................... 35

12.12   Risk of Loss .................................................................................. 36

12.13   Buyer's Inspection ......................................................................... 36

12.14   Deed Provsions ............................................................................. 38

12.15   No Offer ....................................................................................... 38

12.16   FIRPTA Cerification ...................................................................... 38

12.17   Waive rof Trial by Jury and Forum Selection ................................... 39

12.18   Governing Law .............................................................................. 40

12.19   Singular/Plural .............................................................................. 40

12.20   Headings ....................................................................................... 40

12.21   Amendments ................................................................................. 40

12.22   Further Agreements; Mutual Cooperation ........................................ 40

12.23   Attorneys' Fees ............................................................................. 41

12.24   Expenses; Taxes ............................................................................ 41

12.25   Entire Agreement .......................................................................... 42

12.26   Indemnity ..................................................................................... 42

12.27   Partial Validity .............................................................................. 43

12.28   Waiver .......................................................................................... 43

12.29   Schedule and Exhibits .................................................................... 43

12.30   No Third Party Beneficiaries .......................................................... 43

12.31   Counterparts .................................................................................. 43

12.32   Not Used ....................................................................................... 43

12.33   No Recordation ............................................................................. 44

12.34   Buyer's Entry ................................................................................ 44

Exhibit A    Legal Description
Exhibit B    Excluded Personal Property
Exhibit C    Operating Contracts
Exhibit D    Occupancy, Possessory or Entry Rights
Exhibit E    Buyer's Organization Documents and Certificate of Good Standing
Exhibit F    Form of Deed
Exhibit G    Form of Bill of Sale

**EXECUTION COPY**

## AGREEMENT OF PURCHASE AND SALE

**THIS AGREEMENT OF PURCHASE AND SALE** ("Agreement") made as of the 9th day of July, 2021 between Christian H. Dribusch, as Chapter 7 Trustee for Ambica M&J Two LLC ("Ambica"), Jagdamba II Corp. ("Jagdamba II") and Maha Laxmi II Corp. ("Maha", and together with Ambica and Jagdamba II, the "Debtors"), having an office at c/o The Dribusch Law Firm, 1001 Glaz Street, East Greenbush, New York 12061 ("Seller") and VIA TAVDI LLC, a limited liability company formed and existing under the laws of the State of New York, having an office at 17 Old Gick Road, Saratoga Springs, New York 12866, or its designee, ("Buyer", and together with Seller, the "Parties" and each separately, a "Party");

## WITNESSETH:

WHEREAS, on January 11, 2021 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court").

WHEREAS, on January 13, 2021, Ambica filed a motion for joint administration of its case with the Jagdamba case and the Maha case. That motion was granted on January 15, 2021 and the cases are being jointly administered under case number 21-10014 (the "Bankruptcy Cases").

WHEREAS, on February 15, 2021, SDI Matto JV Holdco LLC (the "SDI") filed a motion seeking entry of an order converting the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code.

WHEREAS, on February 24, 2021, the Bankruptcy Court entered an order converting the Bankruptcy Cases to cases under Chapter 7.

WHEREAS, on February 24, 2021, the United States Trustee appointed the Seller as the

Chapter 7 trustee in the Bankruptcy Cases.

WHEREAS, pursuant to section 704(a)(1) of Title 11 of the United States Code (the "Bankruptcy Code"), the Seller has the right and duty to, among other things, liquidate the Debtors' property and distribute the proceeds from such liquidation to the Debtors' creditors; and

WHEREAS, any and all rights and remedies granted to the Seller hereunder shall inure to the benefit of the Debtors, their bankruptcy estates, and any successor to the Seller; and

WHEREAS, this Agreement is subject to the approval of the Bankruptcy Court and shall not be effective until the entry of an order of the Bankruptcy Court (a "Sale Order") approving the terms of this Agreement and authorizing the Seller to perform under this Agreement; and

WHEREAS, Ambica is the fee owner of a parcel of land more particularly described on Exhibit "A" attached hereto and the buildings and improvements situated thereon (the "Premises"), which Premises are known as 15-17 Old Gick Road, Saratoga Springs, New York and by the Saratoga County Tax Map designation: Section 153, Block 3 and Lot 55.2; and

WHEREAS, a Comfort Inn and Suites, which is owned by Maha, is operated on the Premises (the "Hotel") by the Seller; and

WHEREAS, Seller is authorized to operate the Hotel pursuant to an order of the Bankruptcy Court (the "Operating Order"), and has designated Niral Patel (the "Manager"), a third-party manager, who operates the Hotel on Seller's behalf; and

WHEREAS, the on-site restaurant, Golden Corral (the "Restaurant"), which is owned by Jagdamba II, was closed in 2020 and has not operated since that time. As of the Petition Date, Northeast Dining & Lodging, Inc. ("NDL") occupied and used a portion of the

2

restaurant space pursuant to a month-to-month tenancy; and

WHEREAS, Seller desires to sell to Buyer the Premises, together with the Hotel and Restaurant and all related assets and business identified herein, as an ongoing concern, upon the terms and conditions hereinafter set forth; and

WHEREAS, Buyer desires to purchase the Purchased Property; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the Parties agree as follows:

## ARTICLE  1.
## ASSETS PURCHASED AND SOLD

Section 1.1.   Upon and subject to the terms and conditions set forth herein, Seller agrees to sell, and Buyer agrees to purchase the Premises, together with the Hotel and Restaurant and all related assets and business identified herein (hereinafter collectively called the "Purchased Property"), actual and exclusive physical possession of which the Seller shall deliver to Buyer at the Closing:

(a)   Ambica's fee interest in the land described on Exhibit "A" attached hereto (the "Land").

(b)   The buildings and improvements on the Premises (collectively, the "Buildings"), including, without limitation, all banquet or meeting rooms, sundry shops and all other facilities located in said buildings and improvements or on the Premises; all recreational facilities on the Premises; and all improvements or facilities located on the Premises which may be used in the operation of any of the foregoing.

(c)   Ambica's  fee interest, if any, in (i) any land lying in the bed of any street or highway, opened or proposed, in front of or adjoining the Premises to the center line thereof,

3

including, without limitation, any strips, gaps or gores, (ii) any unpaid award for any taking by condemnation or any damage to the Premises or the improvements located thereon, (iii) all of the easements, rights, privileges and appurtenances belonging or in any way pertaining to the Premises or the improvements located thereon and (iv) all oil, gas and mineral rights appurtenant to the Premises.

(d)    All businesses involving or transacted at the Hotel and the Restaurant, including, without limitation, related services and the use of the names associated with all such businesses.

(e)    All fixtures placed on, attached to, or used or useful in the operation of the Hotel and Restaurant, or the real property on which it is located.

(f)    All furniture, furnishings, operating equipment, linens, tools and all other tangible property, used in connection with the maintenance or operation of the Hotel and Restaurant, located on the Premises, including, any and all electric bulbs, matches, partitions, vaults, safes, fire extinguishing equipment, spare parts and supplies, chairs, tables, beds, bed springs, mattresses, couches, lamps, waste baskets, desks, towels, blankets, silver, silverware, barware, china, dishes, cutlery, glassware, cabinets, curtains, draperies, pictures, radios, televisions, soap and pool chemicals and other furniture and furnishings for the lobby, halls, lavatories and other public rooms and places and for the bedrooms, baths and other private rooms and the furniture, typewriters, personal computers, printers, computers, furnishings, and equipment for the offices, and materials and supplies, and any and all replacements and substitutions thereof and additions thereto (the "Personal Property"), except Personal Property owned by parties other than Seller under title retention contracts or personal property leases, which are more specifically referred to on Exhibit "B" attached hereto.

4

(g)    To the extent the same are transferable, all right, title and interest of the Debtors in and to contracts, warranties, guarantees, licenses, permits, authorizations, consents, approvals, agreements, leases (both real and personal) and other arrangements used or useful in connection with the operation of the Hotel and Restaurant, including without limitation those described on Exhibit "C" attached hereto and made a part hereof (collectively, the "Operating Contracts").

(h)    All the Debtor's books and records to the extent relating to the business and/or operations of the Hotel and Restaurant including, but not limited to, sales records and personnel records and policies (collectively, the "Books and Records").

(i)    All unopened packages or containers of inventory, goods, and operating supplies (collectively, "Operating Supplies") located on the Premises and used in connection with the maintenance or operation of the Hotel or the Restaurant, including, but not limited to, the following inventory and operating supplies, whether or not such inventory or supplies are in storage or in use at the Hotel or the Restaurant:

(i)    all laundry, cleaning and paper supplies and all printing and stationery, such as menu stock, bill heads and advertising matter;

(ii)    all new and unused engineers' and painters' supplies;

(iii)    all new and unused employees' uniforms and all other employees' uniforms currently in use;

(iv)    all fuel actually delivered to the Hotel;

(v)    miscellaneous supplies, and any and all replacements, substitutions and/or additions to any of the items listed in this paragraph (g); and

(vi)    subject to the laws, orders, rules, and regulations of the Alcoholic

5

Beverage Control Board and of the State Liquor Authority, all unopened liquor at the Hotel and Restaurant, if any.

(j)    All the Debtors' right, title, and interest in and to the purchase orders (the "Purchase Orders").

(l)    All the Debtors' right, title, and interest in and to all advance bookings (i.e., reservations for banquets, meeting facilities and guest rooms), which are presently outstanding, or which are entered into between the date of this Agreement and the Closing in accordance with the provisions of Section 6.13 hereof (the "Advance Bookings").

(m)    Debtors' interest in and to all leases, term agreements, licenses, concessions and other oral or written agreements granting any occupancy, possessory or entry rights in or to all or any portion of the Premises or the improvements located thereon, including without limitation those identified in Exhibit "D" annexed hereto and made a part hereof.

(n)    Debtors' interest in and to all rights to contest the real property tax assessment on the Land and Buildings, including without limitation the filing of tax assessment grievances and tax certiorari proceedings.

## ARTICLE  2.
## "SUBJECT TO" PROVISION

Section 2.1.    The Purchased Property is to be transferred subject only to the following ("Permitted Encumbrances"):

(a)    State of facts that an accurate survey would disclose.

(b)    Consents of record for the erection of any structures on, under or above any streets on which the Premises about.

(c)    Any building or zoning ordinances or any other applicable laws and

governmental regulations that affect the use and maintenance of the Premises, provided that same do not prohibit the use and operation of the Property as a hotel (including without limitation, operation of the Restaurant).

(d)    All notes or notices of violations of law or municipal ordinances, orders or requirements noted in or issued by the Departments of Housing and Buildings, Fire, Labor, Health or other State or municipal departments having jurisdiction against or affecting the Premises ("Violations").

(e)    Possible lack of right to maintain vaults, coal vault covers, coal chutes, fuel tanks, fill pipes, transformers, and other installations, if any, beyond the building lines.

(f)    Variations between the record lot lines of the Premises and those shown on the tax map, provided same do not render title unmarketable.

(g)    The claims, liens and encumbrances of any real estate taxes of any kind, including without limitation, school taxes, county taxes, city taxes and town taxes.

(h)    The lien of any assessments, vault charges and water and sewer charges, if any for the current year.

(i)    Covenants, restrictions, easements and party wall reservations, and agreements of record, if any, provided same do not prohibit the use and operation of the Premises as a hotel (including without limitation operation of the Restaurant) and provided further that the existing improvements may remain so long as they may stand.

(j)    Encroachments or projections upon any street or road of areas, grating, steps, windows, balconies, ornamental stone, tile, brick, eaves, trim, and cornices.

(j)    Variations, if any, between fences, retaining walls and record lines.

(k)    All leases or tenancies set forth on Exhibit D and any new leases or tenancies

7

not prohibited by this Agreement.

(m)     The standard printed exceptions contained in any certificate of title or title policy issued to Buyer by any title company authorized to issue title insurance in the State of New York.

(n)     Such other matters as any reputable title insurance company shall be willing to except with insurance against collection out of or enforcement against the Premises as to the fee.

(o)     The lien of taxes and assessments not yet due and payable.

(p)     Any recorded covenants, restrictions, easements, or agreements.

(q)     Any environmental conditions.

Section 2.2.    <u>Assumed Liabilities</u>.    The Buyer shall assume and pay at Closing all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Buyer of the Operating Contracts ("<u>Cure Costs</u>"). In addition, the Buyer shall assume and pay any and all real property taxes due and owing on the Purchased Property as of the Closing Date, including without limitation, school taxes, county taxes, city taxes and town taxes. ("<u>Real Property Taxes</u>"), and Buyer expressly agrees that notwithstanding anything to the contrary contained herein, it is purchasing the Purchased Property subject to any liens arising from or relating to the Real Property Taxes.   Except as expressly set forth in this Agreement, Buyer shall not assume or be obligated to pay, perform, or otherwise discharge any liability or obligation of the Debtors' arising prior to the Petition Date.

## ARTICLE  3.
## <u>TITLE COMPANY</u>

Section 3.1.    <u>Title Company.</u>

(a)    Seller shall give and Buyer shall accept such title as any reputable title insurer licensed to do business in the State of New York (the "<u>Title Company</u>") will be willing to approve and insure at regular rates, subject only to the Permitted Encumbrances.

(b)    Buyer shall obtain a commitment for title insurance (the "<u>Title Commitment</u>") from the Title Company and shall furnish counsel for Seller with a copy of same and any tax search, departmental searches, survey, and survey reading, within twenty (20) days after the entry of the Sale Order. In addition, Buyer shall notify Seller of its objection to certain items or statements of fact shown on such report which shall not be a permitted encumbrance under Article 2 hereof ("<u>Title Defects</u>").  Seller shall have the right to attempt to remedy any Title Defects and shall be entitled to reasonable adjournments of the closing for such purpose.

Any items or statements of fact which appear on the Title Commitment which Buyer does not object to pursuant to the preceding sentence shall be deemed waived. As to additional Title Defects arising between the date of the Title Commitment and the Closing, Buyer agrees to notify Seller of its objection to any such additional Title Defects immediately upon receipt of notice of such additional Title Defects.

(c)    In the event Seller receives written notice of a Title Defect, as set forth hereinabove, Seller shall use reasonable efforts to cause such Title Defect to be cured and/or removed in accordance with the provisions set forth below; provided, however, that, except as otherwise provided in this Agreement, Seller shall not be required to expend any monies to cure any such Title Defect.

(d)    If any Title Defect cannot be or is not cured by Seller prior to the Closing, and Seller's reasonable efforts notwithstanding, at Sellers' option, Seller may elect by written

9

notice to Buyer to adjourn the Closing for one or more periods of time, but not beyond more than sixty (60) days, to continue its reasonable efforts to cure such Title Defects. If any such Title Defect cannot be or is not cured by Seller within the extension period described above, Seller's reasonable efforts notwithstanding, Buyer shall be entitled, at its option, within ten (10) days after the end of such extension period, either: (i) to terminate this Agreement and receive a refund of the Deposit; (ii) to purchase the Property subject to such Title Defects; or (iii) to pay, bond or otherwise discharge the same.  In the absence of any action by Buyer within such ten (10) day period, as set forth above, Buyer shall be deemed to have elected the course of action set forth in (ii) above. Notwithstanding anything contained herein to the contrary, Seller shall not be required to bring any quiet title action or institute or participate in any other litigation to cure any Title Defect.

## ARTICLE   4.

## PURCHASE PRICE

Section 4.1. The purchase price ("Purchase Price") is Eight Million Two Hundred Seventy-Five Thousand Dollars ($8,275,000), plus the Cure Costs, payable as follows:

(a)    On the date on which this Agreement is executed,  Buyer shall deliver to Christian H. Dribusch, as Chapter 7 Trustee and as escrow agent ("Escrow Agent") a down payment in the amount of Four Hundred Sixty Thousand Dollars ($460,000.00) (the "Down Payment").  Seller in his official capacity as Chapter 7 Trustee shall serve as Escrow Agent and hold the Down Payment in the trustee's estate bank account; and

(b)    At Closing, Buyer shall deliver Seven Million Eight Hundred Fifteen Thousand Dollars ($7,815,000) (subject to adjustment pursuant to the terms of this Agreement), plus the Cure Costs and Real Property Taxes to Christian H. Dribusch, as Chapter 7 Trustee.

10

(c)    Buyer and Seller agree that the value of the Personal Property which is sold to Buyer hereunder and which is included in the Purchase Price set forth above is Two Hundred Seventy-Five Thousand Dollars ($275,000.00) ("Personal Property Price Allocation"), and the Parties agree that such allocation has been arrived at by a process of arm's length negotiation, including the Parties' best judgment as to the fair market value of the Personal Property. The Personal Property Price Allocation shall be allocated by Buyer among the Personal Property in accordance with Section 1060 of the Internal Revenue Code (it being understood and agreed that Buyer shall base such allocation on the relative fair market values of the Personal Property as reasonably determined by Buyer) and shall be set forth by Buyer in a written notice delivered to Seller within one hundred eighty (180) days after the Closing. The Buyer and Seller shall prepare and file their respective federal, state, and local income Tax returns, together with a copy of Internal Revenue Service Form 8594, on a basis consistent with the foregoing allocations, and shall not take any tax reporting position inconsistent therewith. The provisions of this paragraph 4(c) shall survive the Closing.

## ARTICLE  5.
## ACCEPTABLE FUNDS

Section 5.1.    All money payable under this Agreement unless otherwise specified, shall be either:

(a)    Good unendorsed certified check of Buyer, or official check of any New York Clearing House member bank; or

(b)    Wire transfer, or

(c)    As otherwise agreed to in writing by Seller's attorney.

## ARTICLE 6.
## PRORATIONS

Section 6.1.    Effective Time. It is understood that, unless otherwise agreed herein, the time for determining the proration of all matters to be prorated under this Agreement shall be as of 11:59 P.M. on the day immediately preceding the Closing.

Section 6.2.    Taxes. At Closing, general real estate, and personal property taxes, if any, for the tax year of the Closing and occupancy taxes shall be assumed and paid by the Buyer.

Section 6.3.    Insurance. All insurance policies, including, without limitation, fire, and any additional hazard insurance, shall be maintained in full force and effect until the Closing and shall be canceled or transferred to Buyer as of the Closing, and any refunded premiums shall be retained by or reimbursed to Seller, as the case may be.

Section 6.4.    Utilities. Prior to the Closing, Seller shall notify all utility companies servicing the Purchased Property of the prospective change in ownership on the Closing and shall direct that all meters be read during the daylight hours on or immediately prior to the Closing and that all billings for services after the Closing be made to Buyer at the Premises without interruption of service. Seller shall be responsible to pay all charges for utilities up to the Closing. In the event that meter readings as of or immediately prior to the Closing cannot be obtained in time for the Closing, then charges for utilities shall be prorated on the basis of the most recent bills that are available.  If the apportionment is not based on actual current readings, then, upon the taking of a subsequent actual reading, such apportionment shall be readjusted and Seller or Buyer, as the case may be, promptly shall deliver to the other the amount determined to be due upon such readjustment. All other utility bills received by Seller

12

after the Closing shall be promptly forwarded to Buyer together with the amount, if any, owed by Seller therefore pursuant to the provisions hereof. The Parties agree to fill out the customary forms required by the telephone company to assign the existing phone and fax numbers at the Hotel to Buyer and to take such other action as is necessary to transfer the Hotel's E-Mail address to Buyer. Any charges for utilities which are paid on a monthly basis and are not metered will be prorated as of Closing.

Sewer rent, if any, shall be prorated on the basis of the fiscal period for which such sewer rents are assessed. At the Closing, Buyer shall pay to Seller the amount of all deposits on account with the suppliers of such utilities for the Hotel made by Seller or Manager, if the same are transferable and assigned to Buyer at Closing, to the extent Seller or Manager provides evidence thereof; otherwise, all such deposits shall remain the property of Debtor and Buyer shall be responsible for paying any deposit required of Buyer by the suppliers of such utilities. Buyer shall cooperate to ensure the prompt release of utility deposits, if any, to Seller at Closing. The provisions of this Section 6.4 are intended to survive Closing.

Section 6.5.    Operating Contracts.  All income, expenses, and obligations with respect to any Operating Contracts, including, but not limited to, service contracts, equipment rental contracts and other contracts and agreements which Buyer elects to assume or are not terminable or are terminable with payment of a penalty (except those which Buyer elects to terminate by payment of the penalty at its own expense), will be prorated between the Parties as of the Closing. All other Operating Contracts shall, at Buyer's direction given at least twenty (20) days prior to Closing, be terminated by Seller and Buyer shall not be responsible for the payment of any prepaid expense associated therewith. Any prepaid rents or security deposits previously paid by Seller or Manager under any lease or other occupancy or use

13

arrangements which are transferred to Buyer, if any, shall be a credit to Seller at Closing.

Section 6.6.    <u>Vending and Game Machines.</u> Buyer acknowledges that vending machines (including, without limitation, postage meters and pay telephones) and game machines may be emptied, and receipts therefrom recorded by the owner thereof on or before 11:59 P.M. of the day prior to the Closing, it being understood that Seller is entitled to all net receipts with respect to the vending and game machines up to 11:59 P.M. of the day prior the Closing and Buyer shall be entitled to all net receipts thereafter.

Section 6.7.    <u>Dues and Commissions.</u> Trade association dues, trade subscriptions and prepaid advertising expenses, if any, shall be prorated as of the Closing Date. Notwithstanding the foregoing, if Buyer notifies Seller that Buyer elects not to join such trade association or receive such trade subscriptions, either because Buyer or an affiliate of Buyer is already a member of such association or already receives such trade subscriptions, or otherwise (other than a trade association which Buyer is required to join or a trade subscription which Buyer is required to receive in connection with the New License Agreement), then same shall not be subject to any proration hereunder.

Section 6.8.    <u>Hotel Business.</u> Such other items (including without limitation items prepaid by Seller or Manager) as are customarily adjusted upon the sale of a hotel business similar to the business of the Hotel, including, without limitation travel agency commissions and commissions of credit referral organizations, if any, shall be adjusted, but cash on hand, "house bank" or other cash reserves of Seller, which shall be removed by Seller prior to Closing, shall be the property of Seller;

Section 6.9.    <u>Accounts Receivable; Room Revenues.</u>

(a)    The final night's revenue (revenue from guest and banquet rooms occupied on

14

the evening prior to the Closing, including foods, beverage, telephone, and similar charges), including any sales taxes, room taxes or other taxes thereon, shall belong to Seller. All other revenues earned from and after 11:59 P.M. of the day prior to the Closing shall belong to Buyer, provided that the hotel room revenue attributable to a guest who checks in the day before the Closing and who vacates hotel accommodations on the Closing Date ("Closing Date Room Revenues") shall belong solely to Seller. Each party shall be responsible for the payment of any sales and/or hotel/motel occupancy taxes collected or otherwise due and payable in connection with the income allocated to such party hereunder and such obligation is hereby intended to survive Closing.

(b)    Any down payments made to Seller or Manager prior to the Closing on Advanced Bookings for any date on or after the Closing will be paid or credited to Buyer at the Closing. Any down payments paid to Seller or Manager on or after the Closing on Advanced Bookings for dates after the Closing will be forwarded to Buyer upon receipt and such obligation is hereby intended to survive Closing.

(c)    Except as provided in Section 6.9(a) above, all accounts receivable and revenues accruing prior to 11:59 P.M. of the day prior to the Closing (including receivables and revenues for food, beverage and telephone and Closing Date Room Revenues) shall be assigned by Seller to Buyer in exchange for Buyer's payment to Seller at the Closing of a purchase price equal to the face value of such accounts receivables and revenues on Debtor's books and records.

Section 6.10. Accounts Payable and Expenses. All accounts payable and expenses related to operations of the Hotel which have accrued during the period from the Petition Date through the Closing shall be paid by Seller on or prior to the Closing. All accounts payable

15

and expenses relating to the operations of the Hotel accruing after the Closing shall be paid by Buyer, and Buyer shall indemnify and hold Seller harmless from any claim, demand, loss, liability, damage, or expense (including reasonable attorneys' fees) arising out of or in connection with all such accounts payable and expenses accruing after the Closing.

Section 6.11. <u>Salaries and Benefits.</u> Seller shall be responsible for accrued benefits, vacations, wages, and other compensation of each employee of the Hotel up to Closing (and the Seller shall deliver a letter to Buyer at Closing attesting to the payment of all such sums), and Buyer shall be responsible for the payment of the salaries, vacations, wages, or benefits of any such employee accruing after the Closing, provided that Buyer elects to hire and employ such employees from and after the Closing. Buyer shall have no obligation to continue the employment of any employee and shall not be liable to any employee for any wages, salaries, bonuses, vacation days, sick days, or personal days in which said employees may have acquired an accrued or vested right by virtue of their employment by the Debtor. Seller shall have the right to pay to each employee on or prior to the Closing any amount of accrued salary and benefits due and owing to such employee as of the Closing Date.

Section 6.12. <u>Advance Bookings.</u>  The aggregate amount of any and all deposits received by Seller or Manager (whether paid in cash or by credit card) as a down payment for reservations made for rooms, banquets, meals, or other services to be supplied from and/or after the Closing ("<u>Advance Bookings</u>") shall be credited against the portion of the Purchase Price payable by Buyer at Closing.

Section 6.13. <u>Operating Supplies.</u> At Closing, Buyer shall purchase from Seller all Operating Supplies at the cost thereof paid by Seller.

Section 6.14. <u>[Not Used].</u>

16

Section 6.15.   <u>Post-Closing Adjustments.</u>   Prorations and adjustments under this Article 6 shall, insofar as feasible, be determined and paid on the day of Closing. If any proration or adjustment provided for herein cannot be made with absolute accuracy as of the Closing, the Parties will estimate such proration or adjustment as accurately as possible and will correct same and pay or receive any correction as soon thereafter as accurate information becomes available. To the extent that any dispute with respect to such proration and adjustment is not resolved within fifteen (15) days after the delivery to Seller of Buyer's objections to Seller's schedule of prorations and adjustments, such differences shall be submitted as soon as practicable thereafter to the Bankruptcy Court for resolution.   This Section 6.14 is intended to survive Closing.

Section 6.16.   [Not Used].

Section 6.15. <u>Computation.</u> All prorations shall be computed by the Parties, or their respective representatives, in a manner consistent with generally accepted motel/hotel accounting practices. At least three (3) business days prior to the Closing, Seller shall furnish to Buyer a tentative statement of proposed prorations. If the computation of prorations under this Article 6 shows that a net amount is owed by Buyer to Seller, such amount shall be paid in cash to Seller by Buyer on the date of Closing. If the computation of prorations under this Article 6 shows that a net amount is owed by Seller to Buyer, such amount shall be credited against the Purchase Price due at Closing. Any errors or omissions in computing apportionments at Closing shall be promptly corrected as soon as they are discovered.   The terms and provisions of this Section 6.15 shall survive the Closing.

## ARTICLE  7.
## <u>REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER</u>

Buyer represents and warrants to Seller as follows:

Section 7.1. <u>Existence, Ownership and Good Standing</u>.  Buyer is a duly organized limited liability company and validly existing under the laws of the State of New York.  All of the equity interests of Buyer are owned, of record and beneficially, as set forth on Exhibit "E" attached hereto.

Section 7.2. <u>Authority.</u> Buyer has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby pursuant to the terms and conditions of this Agreement. The execution, delivery and performance of this Agreement by Buyer have been duly and validly authorized by all necessary action. This Agreement has been duly executed and delivered by Buyer and constitutes its valid and binding obligation enforceable in accordance with its terms.

Section 7.3. <u>No Conflict.</u> The execution and delivery of this Agreement by Buyer and the consummation of the transactions contemplated hereby (i) will not require the consent of any other person or entity; (ii) will not violate any provisions of its organizational documents; and (iii) will not, either alone or with the giving of notice or the passage of time or both, conflict with, constitute grounds for termination of, or result in a breach of the terms, conditions, or provisions of, or constitute a default under any contract, instrument, license or permit, individually or in the aggregate, material to the transactions contemplated hereby and to which it is now subject.

Section 7.4. <u>Hart-Scott Filing.</u> No filings with the Federal Trade Commission or the United States Department of Justice are required under Section 7A of the Clayton Act or the

regulations thereunder in connection with the transactions contemplated by this Agreement.

Section 7.5. Survival. All representations and warranties made by Buyer in this Agreement shall be deemed renewed by Buyer on the Closing Date as if made at such time.

## ARTICLE 8.
## INDEMNITIES; REMEDIES

Section 8.1. (a) Buyer's Indemnity. Buyer shall fully indemnify and hold harmless Seller and the Debtors' estates and every entity affiliated with Seller and Debtors, and all of their officers, directors, partners, shareholders, employees, agents, attorneys and independent contractors, and the successor of each and every one of them, from any claim, demand, loss, liability, damage or expense (including reasonable attorneys' fees) arising out of or in connection with Buyer's ownership and operation of the Purchased Property after the Closing Date and arising from or relating to the Real Property Taxes.

Section 8.2. Seller's Remedies. Buyer and Seller agree that in the event of a material breach by Buyer of any material provision of this Agreement, the damages that Seller will sustain as a result thereof will be substantial but will be difficult to ascertain. Accordingly, Buyer and Seller agree that, in the event of the Buyer's material breach of a material provision of this Agreement, Seller may terminate this Agreement upon written notice to Buyer of such breach, which breach cannot be cured or has not been cured within fifteen (15) business days after the giving of written notice by Seller to Buyer of such breach.

In the event of such a termination, Seller shall be entitled to the greater of (i) the Deposit or (ii) the difference between the Purchase Price and the purchase price received by Seller from a sale of the Purchased Property to another party. In such event, Buyer hereby irrevocably directs the Escrowee (as hereinafter defined) to pay the Deposit to Seller and this

19

Agreement shall be considered terminated.

Section 8.3. <u>Buyer's Remedies.</u> If Seller shall be in material breach under any material provision of this Agreement, then Buyer shall have only one of the following remedies: (i) to terminate this Agreement and receive a refund of the Deposit or (ii) to obtain specific performance of this Agreement; upon written notice to Buyer of such breach, which breach cannot be cured or has not been cured within fifteen (15) business days after the giving of written notice by Buyer to Seller of such breach.

Section 8.4. <u>Survival.</u> The terms and provisions of this Article 8 shall be deemed renewed by Buyer and Seller on the Closing Date as if made at such time and shall survive the Closing or earlier termination of this Agreement.

## ARTICLE 9.
## CONDITIONS OF CLOSING

Section 9.1. <u>Conditions to Seller's Obligation.</u> The obligation of Seller to close is subject to Buyer having performed all obligations required to be performed by it under this Agreement and all other conditions to Seller's obligations, as set forth in this Agreement, shall have been substantially complied with.

Section 9.2. <u>Conditions to Buyer's Obligation.</u> The obligation of Buyer to close is subject to the satisfaction of all conditions set forth in this Agreement, including, without limitation, all of the following conditions, unless waived in writing by Buyer.

(a)    The representation and warranties of Seller in this Agreement shall be substantially true and correct at the Closing as if made on and as of the Closing, except as otherwise set forth herein.

(b)    The assumption by Debtors and assignment to Buyer of the Franchise

20

Agreement by and between Golden Corral Franchising Systems, Inc. and Jagdamba II, dated July 2, 2001, as modified in such manner reasonably satisfactory to Buyer.

(c)    The assumption by Debtors and assignment to Buyer of the Franchise Agreement by and between Choice Hotels International, Inc. and Maha, dated June 27, 2006, as modified in such manner reasonably satisfactory to Buyer.

(d)    Seller shall have performed all obligations required to be performed by it under this Agreement and all other conditions to Buyer's obligations, as set forth in this Agreement, shall have been substantially complied with.

(e)    Buyer, at its own expense, has received a lodging establishment permit from Saratoga County for the operation of the Hotel and an eating and drinking establishment permit for the operation of the Restaurant.

## ARTICLE  10.
## CONVEYANCE OF ASSETS

Section 10.1. Seller will convey the Purchased Property to Buyer at the Closing pursuant to the following instruments ("Closing Documents") and shall deliver the following instruments at Closing:

(a)    Deed. A Trustee's Deed substantially in the form attached hereto as Exhibit "F" (the "Deed"), which shall convey the Premises free and clear of all claims, liens, and encumbrances, except as set forth herein.  Notwithstanding anything contained herein to the contrary, it is expressly agreed that Buyer is purchasing the Premises subject to any and all claims, liens and encumbrances arising from or relating to the Real Property Taxes.

(b)    Bill of Sale for Personal Property. A bill of sale in the form attached hereto as Exhibit "G", conveying to Buyer all the Personal Property and Operating Supplies, except

Personal Property subject to title retention contracts or personal property leases, free and clear of all liens and encumbrances other than those specifically assumed or accepted by Buyer, including without limitation the Real Estate Taxes and any related claims, liens and encumbrances.

(c)     Assignment and Assumption of Operating Contracts. Seller and Buyer shall execute and deliver counterparts of an Assignment and Assumption of Operating Contracts with respect to those Operating Contracts Buyer is assuming as set forth in Section 6.5 hereof. Seller shall deliver evidence to Buyer of the termination of those Operating Contracts Seller is obligated to terminate as set forth in Section 6.5 hereof, if any.

(d)     Motor Vehicles. Certificates of Title to the motor vehicles, if any, forming a part of the Personal Property owned by Seller.

(e)     FIRPTA Certification. FIRPTA certification referred to in Section 12.17.

(f)     TP-584. New York State transfer tax form duly executed by Seller and Buyer.

(g)     Safe Deposit Boxes. All keys to each safe deposit box at the Hotel, if any (other than duplicate keys for safe deposit boxes in use by hotel guests on the day of Closing), all receipts and agreements relating thereto and a complete list of such safe deposit boxes in use, which list shall contain the name and room number of each depositor.  At the Closing, all keys to all safes, and all safe combinations, shall be delivered to Buyer. Immediately prior to Closing, Seller and Buyer shall prepare an inventory of all safe deposit boxes and safes, and Seller shall cause written notice to be sent to each depositor with respect to all safe deposit boxes and safes, requesting verification of the contents of each depositor's safe deposit box or its deposit in any safe within 24 hours. Such notice shall be placed in each depositor's message box at the Hotel. All such inventories and verifications shall be made under the

22

supervision of representatives of Seller and in the presence of representatives of Buyer. Should the depositors wish to continue the use of a safe deposit box or safe, arrangements shall be made for such continued use with representatives of Buyer. After the Closing, Seller shall be relieved of any and all responsibility in connection with items deposited in safe deposit boxes, and Buyer shall indemnify and hold harmless Seller from and against any and all claims, damages, and expenses (including reasonable attorney's fees) arising out of or incurred by Seller as a result of any claim arising after the Closing with respect to the contents of any safe deposit box. On the day of Closing, representatives of Seller and Buyer jointly shall take an inventory of all baggage, valises and trunks checked or left in the care of Seller or the Manager at the Hotel.

(h)     Plans. Plans and specifications, technical manuals, and similar material, for the Hotel and all other improvements on the Premises, if any, in the possession or control of Seller, or any of his representatives, agents or employees.

(i)     Operating Contracts. All Operating Contracts.

(j)     Books and Records. All Books and Records in Seller's possession.

(k)     Supplies. All Operating Supplies.

(l)     Warranties. If assignable, any and all unexpired warranties and guarantees, or copies thereof, with respect to the Purchased Property, together with individual or omnibus assignments thereof to Buyer. If any such warranties or guarantees are not assignable, Seller agrees to reasonably cooperate with Buyer after the Closing to the extent required to enforce any rights under such warranties or guarantees, at Buyer's expense.

(m)     Advance Bookings. An assignment of all Advance Bookings and the delivery of all deposits in connection therewith. Buyer shall receive a credit against the Purchase Price

23

for the amount of such deposits, as more particularly set forth in Section 6.13 above.

(n)     <u>Keys.</u> All keys not then in the possession of guests of the Hotel and master keys to all locks located on the Premises.

(o)     <u>All Required Instruments and Items.</u> All other instruments, documents, personalty, or items required to be delivered by Seller to Buyer in accordance with the terms of this Agreement or as reasonably necessary in order for Seller to consummate the transactions contemplated by this Agreement.

(p)     <u>Assignment of Trade Names.</u> An assignment of Seller's interest in and to all trade names used in connection with the Purchased Property.

## ARTICLE  11.
## <u>THE CLOSING</u>

Section 11.1. <u>Closing Defined.</u> "Closing" means the settlement of the obligations under this Agreement including the payment of the Purchase Price (as adjusted), and the delivery to Buyer of the Closing Documents.

Section 11.2. <u>Closing Date.</u> Closing will take place within sixty (60) days after the Bankruptcy Court enters an order approving this Agreement and authorizing Seller to consummate the transaction contemplated herein, **TIME IS OF THE ESSENCE** (such date herein referred to as the "<u>Closing Date</u>") and will occur when Buyer and Seller's counsel have confirmed that all required deliveries have been received by such counsel in escrow, they will confirm such fact to the Parties hereto and Buyer will then cause wire payment of the Cash Consideration to be made to Seller.

## ARTICLE  12.
## <u>MISCELLANEOUS COVENANTS AND PROVISIONS</u>

Section 12.1. <u>Operation of Business.</u>

24

(a)     From the date hereof, Seller shall continue to operate and maintain the Property in the ordinary course of business and in a manner consistent with past practices. Seller shall not make any significant physical alterations to the Property nor change any existing procedures, policies or practices which would have a material adverse effect on Buyer's operation of the Property after the Closing without first consulting with Buyer and obtaining Buyer's written consent.

(b)     In addition, Seller shall continue the Debtor's usual program of maintenance and repair of the Purchased Property, shall maintain all inventories and supplies at substantially the same level as exist on the date hereof, shall continue the Purchased Property's standard of operation, and shall continue the customary staffing of the Purchased Property in a manner consistent with its past practices and in such manner as to preserve intact the operations of the Purchased Property and to foster the continuance of beneficial relationships with guests, customers, suppliers and others having business dealings with it, and shall maintain and deliver the Purchased Property, including without limitation the Hotel, on the Closing Date with all rooms and suites in substantially the same condition, subject to reasonable wear and tear, as existed on the date hereof. Buyer shall honor all bookings made by Seller in the ordinary course of business prior to Closing, provided that same has been made in accordance with the provisions of this Section 12.1.

(c)     From the date hereof, Seller shall afford Buyer and its authorized representatives, attorneys, accountants and engineers reasonable access during normal business hours to all properties, files, books, records, agreements, contracts and other documents of Seller relating to the Purchased Property, permit the reasonable copying of any

25

of the foregoing at Buyer's expense and furnish or cause to be furnished to the Buyer and its authorized representatives all financial, commercial, operating and other information with respect to the affairs and business of the Purchased Property as Buyer may reasonably request.

(d)    From the date hereof, and except as provided in this Agreement, Seller shall not cause or permit, by any act or failure to act, the Operating Contracts, including, but not limited to, the licenses, permits and other authorizations presently used or useful in the operation of its Purchased Property, to expire or to be surrendered or modified, or take any action which would cause any governmental authority or any party to institute any action or proceeding to terminate, suspend, revoke or adversely modify any Operating Contract.

(e)    Seller covenants and agrees not to take any action to reduce the coverages now afforded by the insurance policies applicable to the Purchased Property or the operation of the Hotel and Restaurant and shall keep such insurance policies in full force and effect until Closing.

Section 12.2. <u>Condemnation or Casualty.</u>

(a)    If prior to the Closing, the Premises are condemned or the Hotel or any other portion of the Property is damaged by fire or other casualty to the extent that the cost of repairing such damage, excluding business interruption, shall amount to at least $500,000.00, as determined by the casualty insurer or insurers insuring the Hotel, then, in any such event, Buyer shall have the right to elect not to purchase the Property. Seller shall notify Buyer promptly of such condemnation or fire or other casualty (which notice must contain the amount of compensation offered for such condemnation or of the amount of any insurance proceeds to be paid on account of such casualty as determined by the insurer or insurers, as the case may be). Buyer shall notify Seller of its election by notice to Seller in

writing delivered within ten (10) days after the receipt by Buyer of the notice from Seller regarding such condemnation or casualty and if Buyer elects not to purchase the Property, the Deposit shall be returned to Buyer and all Parties hereto shall each be released and discharged from any further obligation to each other hereunder with respect to the Property and this Agreement shall be deemed terminated and of no further force or effect; but if Buyer elects to purchase the Property, the purchase contemplated herein shall be consummated without reduction of the Purchase Price, on the later of thirty (30) days after the expiration of the 10-day period during which Buyer could have elected not to purchase or on the Closing Date provided in Section 11.2, but Buyer shall be entitled to all proceeds of fire or other casualty insurance or condemnation and Seller shall have no responsibility for the restoration or repair of the Property.

(b)     If, prior to the Closing, the Hotel or any other portion of the Property is damaged by fire or other casualty to the extent that the cost of repairing or restoring the same, excluding business interruption, shall be less than $500,000.00, the Closing shall proceed as scheduled herein and Seller shall assign to Buyer the proceeds of any casualty insurance and Seller shall not have any responsibility for the restoration or repair of the Property. However, in the event of a condemnation which costs less than $500,000.00 to repair, but which has a material adverse effect on the value of the Property or the ability to continue to operate the Property substantially in the same manner in which it had been operated prior to the condemnation (e.g., a taking of a substantial portion of the parking area), then Buyer may elect to terminate this Agreement.

(c)     If Buyer does not elect to terminate this Agreement in accordance with the terms hereof, then Seller shall not adjust or settle any insurance claims or condemnation awards

with the insurers or the condemning authority without the prior written consent of Buyer. To the extent that any such insurance proceeds or condemnation awards have not been collected by Seller by Closing, then at Closing, Seller shall assign to Buyer the right to receive and settle same.

Section 12.3. <u>Brokers.</u>  Seller and Buyer hereby covenant and represent to each other that they have not dealt with any brokers in connection with this sale, which representation shall survive Closing. Buyer shall indemnify and hold Seller harmless, and Seller shall indemnify and hold Buyer harmless from and against the claims or alleged claims of any brokers or finders with whom they have respectively dealt in connection with this transaction (together with any and all loss, cost, damage, or expense, including reasonable attorneys' fees, which the Seller or Buyer may sustain or incur by reason of such claims or alleged claims).

Section 12.4. <u>Assessments.</u> If, at the time of Closing, the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purpose of this Agreement all the unpaid installments shall be assumed by Buyer.

Section 12.5. <u>Use of Purchase Price to Pay Encumbrances.</u> If there is any lien or other obligation affecting the sale which Seller is obligated to pay and discharge at Closing, Seller may cause Buyer to use any portion of the Purchase Price to discharge such obligation. Buyer agrees to provide separate certified or official checks payable to the order of each such obligee to assist Seller in causing these obligations to be discharged.

Section 12.6. <u>Transfer and Recording Taxes.</u> At Closing, Buyer shall pay all transfer taxes and other customary seller expenses and Buyer shall also deliver funds sufficient to pay all customary buyer expenses which are required to be paid in order to record the Deed and to

Transfer the Purchased Property, to the appropriate officer from such taxing authorities in payment thereof. Both Seller and Buyer agree to execute and deliver all tax returns required to accompany the payment of any of the foregoing taxes.

Section 12.7. <u>Franchise Taxes.</u> Unpaid franchise taxes affecting title to the Premises shall not be an objection to title provided that the Seller deposits amounts sufficient to cover the same with the Title Company at the time of Closing, said deposit is to be applied toward the payment of said franchise taxes, and the Title Company is willing to insure against collection of same out of the Premises.  Seller agrees to prepare, execute, and deliver to the Title Company the necessary franchise tax returns (or certified copies thereof if previously filed with the appropriate taxing authority).

Section 12.8. <u>Assignment.</u> Neither Buyer's interest under this Agreement nor any portion thereof may be assigned by Buyer, except with Seller's prior written consent, which consent Seller may arbitrarily or unreasonably withhold or delay. Any attempt at such assignment without first obtaining such consent shall be null and void and of no force and effect and shall be deemed to be a material breach of this Agreement by Buyer. The transfer of more than an aggregate of forty-nine percent (49%) equity interest in Buyer, or other change in control of Buyer shall be deemed an assignment for purposes of this Section.

Section 12.10. <u>"As is," "where is," "with all faults" Purchase.</u>

(a)     Buyer has thoroughly and diligently inspected the Premises, the Hotel and the Restaurant and is fully familiar with their physical condition and state of repair.  Except as otherwise provided in this Agreement, Buyer agrees to take the same "as is," "where is," "with all faults" and in their present condition, subject to reasonable use, wear, tear, and deterioration between now and the closing date.

(b)     Buyer acknowledges that neither Seller nor any representative or agent of Seller have made any representation or warranty as to the physical condition, state of repair, expenses or operation of the Premises, the Hotel or the Restaurant or any matter or thing affecting or relating to the Premises, the Hotel, the Restaurant, or this Agreement, except as specifically set forth herein.  Seller and the Debtors shall not be liable or bound in any manner by any oral or written statement, representation, agreement, or information relating to the Premises, the Hotel, the Restaurant, or this Agreement furnished by any real estate broker, agent, or other person, unless specifically set forth herein.

(c)     Buyer further acknowledges that any information, whether written or oral, or in the form of maps, surveys, plats, title reports, soil reports, engineering studies, environmental studies or reports, inspection reports, plans, specifications or any other information whatsoever, without exception, pertaining to the Premises, the Hotel, the Restaurant and the buildings and other improvements thereon or a part thereof, any and all records, rent rolls, leases and other documents pertaining to the use and occupancy of the Premises, the Hotel, or the Restaurant and the income thereof, the cost and expenses of maintenance thereof, and any and all other matters concerning the condition thereof, or other attributes or aspects of the Premises, the Hotel, the Restaurant and buildings and improvements thereon or a part thereof, is furnished to Buyer solely as a courtesy, and Seller has not verified the accuracy of any statements or other information therein contained nor the qualifications of the persons preparing such information. Seller does not warrant the accuracy of any information contained therein in any way and Buyer is not relying on any such information.

(d)     The items and their contents made available to Buyer pursuant to this Section 12.9 of this Agreement, other than maps, surveys, plats, title reports and other documents and

instruments which are a matter of public record, are sometimes referred to herein as the "Confidential Information" irrespective of whether such items and their contents are so specifically identified by Seller. Without Seller's prior written consent, Buyer: (a) shall not divulge to any third party any of the Confidential Information and shall not use the Confidential Information in Buyer's business prior to the Closing, except in connection with the evaluation of and preparation for the acquisition of the Purchased Property; (b) shall ensure that the Confidential Information is disclosed only to such of Buyer's officers, directors, employees, consultants, attorneys, accountants, engineers, architects, investors and lenders, as have actual need for the Confidential Information; (c) shall act diligently to prevent any further disclosure of the Confidential Information; and (d) shall, if the Closing does not occur, promptly return to Seller (without keeping copies) all Confidential Information delivered to Buyer.

(e)     As part of Buyer's agreement to purchase and accept the Purchased Property "as is," "where is," "with all faults" and in their present condition, and not as a limitation on such agreement, except as otherwise expressly set forth herein, Buyer hereby unconditionally and irrevocably waives and quitclaims to Seller any and all actual or potential rights Buyer might have regarding any form of warranty, express or implied, of any kind or type, relating to the Purchased Property and the buildings and other improvements thereon or a part thereof. Such waiver is absolute, complete, total, and unlimited in any way.  Such waiver includes, but is not limited to, a waiver of express warranties, implied warranties, warranties of fitness for a particular use, warranties of merchantability, warranties of habitability, strict liability rights, and claims of every kind and type, including, but not limited to, claims regarding defects which might have been discoverable, claims regarding defects which were not or are not discoverable,

31

product liability claims, product liability type claims, and all other extant or later created or conceived of strict liability or strict liability type claims and rights. Notwithstanding the foregoing, to the extent same are in Seller's possession, Seller will assign to Buyer all existing assignable manufacturers' warranties affecting the Purchased Property, if any, and any other warranties which Seller shall have the right to assert against third parties, if such warranties are assignable, but Seller shall not have any independent duties regarding same.

(f)     Effective upon Closing, and to the fullest extent permitted by law, Buyer hereby releases, discharges and forever acquits Seller and Debtors and every entity affiliated with Seller and Debtors and all of their officers, directors, partners, shareholders, employees, agents, attorneys and independent contractors as well as the spouse of each and every one of them and the successor of each and every one of them from all demands, claims, liabilities, obligations, costs and expenses which Buyer may suffer or incur relating to the Purchased Property, or its improvements or any defect related thereto.

(g)     As part of the provisions of this Section 12.9, but not as a limitation thereon, Buyer hereby agrees, represents, and warrants that the matters released herein are not limited to matters which are known or disclosed, and Buyer hereby waives any and all rights and benefits which it now has, or in the future may have conferred upon it, by virtue of the provisions of federal, state or local law, rules or regulations relating to the Purchased Property, or its improvements or any defect related thereto. In this connection and to the extent permitted by law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and

32

warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge and acquit Seller from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses relating to the Purchased Property, or its improvements or any defect related thereto, which might in any way be included in the waivers and matters released as set forth in Section 12.9. The provisions of this Section 12.9 are material and included as a material portion of the consideration given by Buyer in exchange for Seller's performance hereunder.

Section 12.10. <u>Escrow.</u> The Deposit shall be held in escrow by Christian H. Dribusch, as Chapter 7 Trustee, until the Closing or sooner termination of this Agreement, at which time Escrowee shall pay over or apply proceeds of the Deposit in accordance with the terms of this section.

(a)    The Deposit shall be placed in the Escrowee's non-interest-bearing trustee bank account in accordance with the requirements of law.

(b)    At the Closing, the Deposit shall be paid by Escrowee to the Seller. If for any reason the Closing does not occur, Buyer or Seller may notify the Escrowee and demand payment of the Deposit in accordance with the terms of this section. The Escrowee shall promptly notify the other parties. If no other party objects within five (5) business days after having received notice thereof from Escrowee, the Deposit shall be delivered to the party demanding payment of it. If any party objects to the delivery of the Deposit, Escrowee shall continue to hold the Deposit subject to the direction of the Bankruptcy Court or upon receiving concurring written instructions from all Parties.

(c)    Anything herein contained to the contrary notwithstanding, Escrowee shall

33

have the right at any time, at its sole election, to deposit the escrowed proceeds and interest thereon, if any, with the Bankruptcy Court. Upon such deposit, or payment to any party in accordance with the foregoing provisions, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(d)    Although Escrowee is holding the Deposit for Seller's account, the Parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience; that Escrowee shall not be deemed to be the agent of any of the Parties; and that Escrowee shall not be liable to any of the Parties for any act or omission on its part except for its own gross negligence and willful misconduct.

(e)    Seller and Buyer jointly and severally agree to defend, indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder.

(f)    Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel, except that Escrowee shall act in accordance with a writing signed jointly by Seller and Buyer. Escrowee shall have no duties or obligations other than as stated herein and shall be protected in acting upon any notice, certificate, or other communication which it shall in good faith believe to be valid and to have been signed or presented by a proper person or persons, not only as to the due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information contained therein. Escrowee shall not be bound by any notice, or demand with respect thereto, or any waiver, modification, amendment, termination, or rescission of this Agreement, unless

34

in writing delivered to the Escrowee, and if the duties of the Escrowee are affected, unless it shall have given its prior written consent thereto.  Upon delivery of the Deposit together with accrued interest in accordance herewith, the obligations of Escrowee shall cease with respect thereto and it shall not be required to perform any further act whatsoever pursuant to this Agreement.

(g)    Escrowee shall continue to serve as Chapter 7 trustee of the Debtors and shall be entitled to represent the interests of the Debtors and their estates, their successors, or assigns, in the event of any dispute as to the disbursement of the Deposit or any other dispute between the Parties whether or not Escrowee is in possession of the Deposit and continues to act as Escrowee.

(h)    Escrowee shall acknowledge its agreement to these escrow provisions and receipt of the Deposit by check subject to collection by signing in the place indicated on the signature page of this Agreement.

(i)    Escrowee shall not have any liability or obligation for loss of all or any portion of the Deposit by reason of the insolvency or failure of the institution or depository with whom the escrow account is maintained.

Section 12.11. <u>Notices.</u> All notices required hereunder shall be in writing, signed by an authorized representative of the party giving such notice and sent by certified mail, return receipt requested; overnight national courier; or by hand delivery with written receipt, and shall be directed as follows:

To Buyer:

VIA TAVDI LLC
17 Old Gick Road
Saratoga Springs, New York 12866

Attn: Niral Patel
Email: niralapatel@gmail.com

With a copy to:

Justin A. Heller, Esq.
Nolan Heller Kauffman LLP
80 State Street, 11th Floor
Albany, New York 12207
Tel: (518) 432-3118
Email: jheller@nhkllp.com

To Seller:

Christian H. Dribusch
The Dribusch Law Firm
1001 Glaz Street
East Greenbush, New York 12061
Tel: (518) 227-0026
Email: cdribusch@chdlaw.net

With a copy to:

Fred Stevens
Brendan M. Scott
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Email: fstevens@klestadt.com
        bscott@klestadt.com

Either party may change the address for notice to be given to it by notice given in accordance with this Section. Notice shall be deemed received on the date of hand delivery or on the date such hand delivery is refused by the party to whom the same is directed, on the next day if sent by overnight national courier, or on the third day following deposit in the U.S. mail, if sent by certified mail, return receipt requested.

Section 12.12. <u>Risk of Loss.</u> Seller assumes all risk of loss due to fire or other casualty between the date of this Agreement and Closing, except as provided in Section

36

12.2 hereof.

Section 12.13. <u>Buyer's Inspection.</u>

(a)    Until Closing or sooner termination of this Agreement, Buyer and its attorneys, accountants, engineers, consultants, representatives, agents, and employees shall have the right to enter upon the Premises during normal business hours for testing, and other reasonable inspection purposes. In furtherance of the foregoing (and not in limitation thereof), Seller will give to Buyer, its attorneys, accountants, engineers, consultants, and other representatives, during normal business hours and on reasonable advance notice to Seller, full access to any and all parts of the Property (other than guest rooms, if occupied) and to all books, records and files relating to the Property in the possession of Seller or any third-party manager retained by Seller. Seller will furnish to Buyer all information in the possession of Seller, or any third-party manager retained by Seller concerning the Property which the Buyer, its attorneys, accountants, engineers, consultants, and other representatives may reasonably request. Buyer may, at Buyer's sole cost and expense, during normal business hours (unless otherwise agreed to by Buyer and Seller), upon reasonable advance notice to Seller and with Seller's prior written consent which will not be unreasonably withheld or delayed, (i) cause the Property and any part thereof to be inspected by said engineers, architects and others acting on behalf of Buyer, as Buyer may designate and (ii) cause a full or partial physical count of the Personal Property and all other inventory to be made. Buyer and its representatives may, upon reasonable advance notice to Seller, have conversations or discussions at the Property with any of Seller's or the Manager's managerial level employees in connection with employment by Buyer after

37

Buyer acquires title to the Property. Buyer hereby indemnifies, agrees to defend, and holds Seller and each of Seller's members, employees, agents, and attorneys harmless from any claims, demands, liabilities, damages, costs, and expenses, including reasonable attorneys' fees, costs (including those incurred in proceedings brought under the Bankruptcy Code), for personal injury or property damage caused by such entry upon the Premises, such testing, surveying, engineering and other inspection and examination activities. All such activities shall be conducted in such a fashion so as not to unreasonably interfere with the rights or property of any tenants or others with any possessory interest in any part of the Premises. Buyer hereby agrees to and shall indemnify and hold Seller, the Debtors and the Manager, if any, and each of Seller's, the Debtors' and  the Manager's members, employees, agents and attorneys harmless of, from and against any and all liabilities, suits, claims, losses, costs and expenses, including, without limitation, court costs and reasonable attorneys' fees and costs and damages sustained by or asserted against Seller, the Debtors or  the Manager, including, but not limited to, physical damage, physical injury to Seller's, the Debtors' or  the Manager's employees or agents or contractors and any mechanics' and materialmen's liens, caused by any inspection or examinations conducted by Buyer or its agents. Buyer shall maintain, and shall assure that its agents and contractors maintain, public liability and property damage insurance in amounts and in form and substance adequate to insure against all liability of Seller, the Debtors, and the Manager, arising out of any entry, inspections or testing of the Premises pursuant to the provisions hereof, and Buyer shall provide Seller with evidence of such insurance coverage upon request by Seller.

Section  12.14.  <u>Deed Provisions.</u>  Reference  to  any  and  all  of  the  Permitted

38

Encumbrances may be omitted by Seller in the Deed, but all such provisions so omitted shall survive delivery of the Deed.

Section 12.15. <u>No Offer.</u> This document is not an offer by the Seller, and under no circumstances should this document have any binding effect upon the Buyer or the Seller unless and until the Buyer and Seller shall each have executed the same and have delivered counterparts hereof to each other.

Section 12.16. <u>FIRPTA Certification.</u> Seller represents and warrants to Buyer, such representation and warranty to survive Closing, that Seller is not a "foreign person" as such term is used in Section 1445 of the Internal Revenue Code; and no assignment or transfer of Seller's interest or direction to distribute the proceeds of this transaction will result in Buyer making distribution to a foreign person. At Closing, Seller will execute and deliver to Buyer a certification, properly completed in the form required to satisfy Internal Revenue Service requirements, to relieve Buyer of any withholding requirement.

Section 12.17. <u>Waiver of Trial by Jury and Forum Selection.</u> EACH PARTY HERETO HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION PROCEEDING OR COUNTERCLAIM BASED ON THIS AGREEMENT, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH PARTY TO ACCEPT THIS AGREEMENT. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.  THE

SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.  THE PARTIES EXPRESSLY AGREE TO THE SUBMISSION OF ANY AND ALL DISPUTES ARISING UNDER OR RELATING TO THIS AGREEMENT TO THE BANKRUPTCY COURT.

Section 12.18. <u>Governing Law.</u> This Agreement, being drawn, negotiated, and executed in the State of New York, and pertaining solely to property situated in the State of New York, shall be interpreted, and governed by the laws of the State of New York without regard to the choice of law provisions of such State. This Agreement shall be construed without regard to or aid of canons requiring construction against the party drawing this Agreement.

Section 12.19. <u>Singular/Plural.</u> Any singular word or term herein shall also be read as

40

in the plural and vice versa, whenever the sense of this Agreement may require it.

Section 12.20. <u>Headings.</u> Headings herein are inserted only for convenience and are in no way to be construed as a limitation on the scope of the particular Sections to which they refer.

Section 12.21. <u>Amendments.</u> Except as otherwise expressly set forth in this Agreement, this Agreement may be modified, amended, waived, or canceled only by the written agreement of all of the Parties and the approval of the Bankruptcy Court.

Section 12.22. <u>Further Agreements; Mutual Cooperation.</u> The Parties agree that they will execute and deliver to the others any additional documents, agreements, or instruments reasonably necessary to give effect to this Agreement or any provision hereof. In addition to the obligations required to be performed hereunder by Seller and Buyer, each party hereto (the "requested party") agrees to perform such other acts, and to execute, acknowledge and deliver such other instruments, documents and other materials as the other party hereto (the "requesting party") may reasonably request in order to effect the consummation of the transactions contemplated hereby provided that such acts (including, without limitation, the execution, acknowledgment and delivery of such instruments, documents and materials) do not increase the obligations, liabilities, risks, costs or expenses of the requested party beyond that expressly set forth in this Agreement.

Section 12.23. <u>Attorneys' Fees.</u> If any party is required to retain the services of any attorney to enforce or otherwise litigate or defend any matter or claim arising out of or in connection with this Agreement, then the prevailing party shall be entitled to recover its reasonable attorneys' fees from the party against whom it prevailed.

Section 12.24. <u>Expenses; Taxes.</u> Except as otherwise provided herein, each party

41

hereto shall pay its own expenses incident to this Agreement and the transactions evidenced hereby including all fees of its counsel and accountants, whether or not such transactions shall be consummated. Nothing in this Section 12.24 shall, however, prevent any party hereto from claiming, as damages for the breach of this Agreement, its expenses incident to this Agreement.  Buyer shall, prior to the Closing, in accordance with Section 1141(c) of the New York State Tax Law, give notice to the New York State Tax Commission on Form AU 196.10 of the impending sale, transfer or assignment in bulk of the Purchased Property.  Seller will cooperate with the Buyer in all matters relating to such notice and will furnish any additional information that may be required by the Buyer to satisfy the statutory provisions with respect thereto, including the Business's Certificate of Authority identification number.  If at or before the closing, the New York State Tax Department provides the Seller or the Buyer with a notice (a "Tax Department Notice") that, Seller has or may have unpaid sales taxes, interest and/or penalties by reason of business operations prior to the Closing, an amount equal to the total of the unpaid sales taxes, interest and penalties specified in the Tax Department Notice shall be withheld from the Purchase Price and retained in escrow at Closing, and shall be paid to the New York State Tax Department; any surplus monies remaining in escrow after such payment shall be released to the Seller.  Buyer shall be responsible for the payment of any sales tax incurred in connection with the sale of the Personal Property, and covenants and agrees to indemnify Seller and the Debtors and to hold them harmless against any claim or cause of action which is asserted against Seller or the Debtors by the Tax Department, including reasonable attorneys' fees incurred by Seller in connection therewith, arising out of any failure by Buyer to pay such New York State sales tax.

Section  12.25.  <u>Entire  Agreement.</u>  This  Agreement  sets  forth  all  the  promises,

42

representations, agreements, conditions, and understandings relative to the transactions set forth herein, and no party is relying upon any representations, agreements, conditions, or understandings, either oral or written, other than those expressed in this Agreement.

Section 12.26. <u>Indemnity.</u> Whenever in this Agreement it is provided that any party shall indemnify and hold harmless the other party, then, as a condition to such indemnity, the party indemnified shall promptly give written notice to the indemnitor of any claim or demand made upon it, which is or may be indemnified against, and the indemnitor shall have the right to defend against such claims or demand by counsel of its own choice, provided that such counsel is reasonably acceptable to the party being indemnified. There shall be no settlement of any action arising under any indemnity contained herein without the prior written consent of the indemnitor, which consent shall not be unreasonably withheld. The provisions of this Section shall survive the Closing.

Section 12.27. <u>Partial Invalidity.</u> If any provision of this Agreement shall be declared invalid or illegal for any reason whatsoever, then, notwithstanding such invalidity or illegality, the remaining terms and provisions of this Agreement shall remain in full force and effect in the same manner as if the invalid or illegal provision had not been contained herein.

Section 12.28. <u>Waiver.</u> No failure of any party hereto to exercise any right or power under this Agreement, or to insist upon strict compliance with the provisions of this Agreement, and no custom or practice of any party at variance with the terms and conditions of this Agreement, shall constitute a waiver of such party's right to demand exact and strict compliance by the other party with the terms and conditions of this Agreement.

Section 12.29. <u>Schedule and Exhibits.</u> All schedules and exhibits attached to this Agreement are incorporated into this Agreement by reference as if fully set forth herein.

Section 12.30. <u>No Third-Party Beneficiaries</u>. The provisions of this Agreement are intended to be solely for the benefit of the Parties hereto, and the execution and delivery of this Agreement shall not be deemed to confer any rights upon, nor obligate any of the Parties hereunder, to any person or entity other than the Parties hereto.

Section 12.31. <u>Counterparts.</u> This Agreement may be executed in any number of counterparts, each of which shall be identical and all of which, when taken together, shall constitute one and the same instrument, and any of the Parties hereto may execute this Agreement by signing such counterpart.  Electronic copies of signatures may be used in lieu of originals for the purpose of closing the transaction and in any action or proceeding to enforce the terms of this Agreement.

Section 12.32. <u>[Not Used]</u>.

Section 12.33. <u>No Recordation.</u> Buyer shall not record this Agreement and any attempt to record the same shall be a material default by Buyer hereunder and thereupon, at the option of Seller, this Agreement shall be deemed cancelled and Seller shall have any and all remedies for a default by Buyer as provided herein or by law.

Section 12.34. <u>Buyer's Entry.</u> Whenever Buyer shall seek entry on to the Premise, the Hotel, or the Restaurant under this Agreement, it shall do so by giving Seller not less than three (3) business days prior written notice of the date and the reason that it seeks such entry.

.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date first above written.

**Christian H. Dribusch, as Chapter 7 Trustee, Seller**

By: _____
Christian H. Dribusch, as Chapter 7 Trustee

**VIA TAVDI LLC, Buyer**

By: _____
Niral Patel
Sole Member

Escrow agreed to and receipt of Deposit check is hereby acknowledged:

**CHRISTIAN H. DRIBUSCH, as Chapter 7 Trustee and Escrowee**

By: _____
Christian H. Dribusch, as Chapter 7 Trustee

44

## Exhibit A

## Legal Description

PARCEL NO. 1: BEGINNING at a marble monument found in ground where the easterly bounds of New York State Highway, Interstate No. 87 intersects the westerly bounds of relocated Old Gick Road, running from thence South 04 degrees and 26 minutes West along the westerly bounds of the said re-located Old Gick Road, 418.26 feet to a marble monument found in the ground; thence South 07 degrees and 21 minutes East, still along the same, 361.93 feet to a marble monument found in the ground; thence South 21 degrees and 53 minutes East, still along the same, 461.62 feet to a marble monument found in the ground; thence South 36 degrees and 04 minutes East, still along the same, 95.95 feet to a point for a comer; thence North 73 degrees and 09 minutes West along the no1iherly bounds of-lands conveyed by Edna J. Currier to Trice-Juron Ford, Inc. 675.56 feet to a marble monument found in the ground in the-easterly bounds of Interstate Highway Route 87; thence North 16 degrees and 15 minutes East along the easterly bounds of interstate Highway Route 87, 154.71 feet to marble monument found in the ground; thence North 16 degrees and 18 minutes East, still along the same, 278.35 feet to a marble monument found in the ground; thence North 21 degrees and 28 minutes East, still along the same, 318.94 feet to a marble monument found in the ground; thence North 21 degrees and 25 minutes East, still along the same, 264.99 feet to a marble monument found in the ground; thence North 28 degrees and 37 minutes East, still along the same, I 44.45 feet to the point and place of beginning, containing 7.082 acres of land, be the same more or less.

EXCEPTING therefrom that portion conveyed by Ambica II Corp. to Town of Wilton by deed dated May 8, 2001 and recorded June 11, 2001 in• the Saratoga County Clerk's Office in Book J 582 of Deeds at page I 4, and therein described as follows:

ALL THAT CERTAIN PIECE OR PARCEL OF LAND lying and being in the Town of Wilton, County of Saratoga, and the State of New York, more particularly bounded and described as follows:

BEGINNING at a point in the southwesterly bounds of Old Gick Road at the n01theast comer of the lands of Country Realty Company and the southeast comer of the lands of the grantor herein; thence running along the said northerly line of the lands of Co☐try Realty Company, North 73 degrees, 09 minutes and 00 seconds West, a distance of 117 .1 7. feet to a point therein for a comer; thence running through the lands of the grantor herein North 51 degrees, 55 minutes, and 22 seconds Bast, a distance of 70.69 feet to the southwesterly bounds of said Old Gick Road; thence running South 36 degrees, 04 minutes, and 00 seconds East, along said road, a distance of95.95 feet to the point and place of beginning, containing 3,389 square feet of land to be the same more or less.

## **Exhibit B**

## **Excluded Personal Property**

Cash

Accounts Receivable created and existing prior to 11:59 P.M. on the day prior to the Closing.

Causes of Action

## Exhibit C

## Operating Contracts

(a)    Franchise Agreement by and between Golden Corral Franchising Systems and Jagdamba II, dated July 2, 2001, as modified in such manner reasonably satisfactory to Buyer.

(b)    Franchise Agreement by and between Choice Hotels International, Inc. and Maha, dated June 27, 2006, as modified in such manner reasonably satisfactory to Buyer.

## Exhibit D

## Occupancy, Possessory or Entry Rights

Month to month tenancy of NDL for portion of the Premises

## Exhibit E

## Buyer's Organizational Documents and Certificate of Good Standing

[To Be Provided]

## Exhibit F

## Form of Deed

## Exhibit G

## Form of Bill of Sale

For good and valuable consideration, in the amount of One Million Two Hundred Eighty Thousand and 00/100 Dollars ($1,280,000), the receipt of which is hereby acknowledged, Christian H. Dribusch, solely in his capacity as Chapter 7 Trustee for Ambica M&J Two LLC ("Ambica"), Jagdamba II Corp. ("Jagdamba II") and Maha Laxmi II Corp. ("Maha", and together with Ambica and Jagdamba II, the "Debtors"), does hereby sell, transfer, and convey to VIA TAVDI LLC, a limited liability company formed and existing under the laws of the State of New York, or its designee, ("Buyer") all of Seller's right, title and interest in and to the Personal Property and Operating Supplies, each as defined in the Agreement of Purchase and Sale between Seller and Buyer dated April __, 2021, all other Purchased Property described in the said Agreement of Purchase and Sale contemplated to be conveyed by Seller to Buyer, to the extent conveyance thereof may be effectuated hereby and is not effectuated by another document or instrument executed and delivered by Seller to Buyer substantially contemporaneously herewith.

Seller has executed this Bill of Sale and **BARGAINED, SOLD, TRANSFERRED, CONVEYED** and **ASSIGNED** the Personal Property and Operating Supplies, and Buyer has accepted this Bill of Sale and purchased the Personal Property and Operating Supplies **AS IS, WITH ALL FAULTS AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF WHATSOEVER NATURE, EXPRESS, IMPLIED, OR STATUTORY, IT BEING THE INTENTION OF SELLER AND BUYER TO EXPRESSLY NEGATE AND EXCLUDE ALL WARRANTIES WHATSOEVER, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, ANY RIGHTS OF BUYER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION, ANY CLAIM BY BUYER FOR DAMAGES BECAUSE OF DEFECTS, WHETHER KNOWN OR UNKNOWN WITH RESPECT TO THE PERSONAL PROPERTY, WARRANTIES CREATED BY AFFIRMATION OF FACT OR PROMISE AND ANY OTHER WARRANTIES CONTAINED IN OR CREATED BY THE UNIFORM COMMERCIAL CODE AS NOW OR HEREAFTER IN EFFECT IN THE STATE IN WHICH THE PERSONAL PROPERTY IS LOCATED, OR CONTAINED IN OR CREATED BY ANY OTHER LAW.**

[Balance of Page Intentionally Left Blank]

**Christian H. Dribusch, as Chapter 7
Trustee, Seller**

By: _____
    Christian H. Dribusch, as Chapter 7
     Trustee

**VIA TAVDI LLC, Buyer**

By: _____
    Niral Patel
    Sole Member